1 | Mark Allen Kleiman, Esq.
1640 Fifth Street - Suite 214
2 | Santa Monica, CA 90401
phone (310) 260-2303
3 | fax    (310) 260-2535

4

Attorney for Relator

5

6

7

8                 UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10                    WESTERN DIVISION

11                                    CASE NO. CV08-06403 MRP (AGRx)

12 | UNITED STATES ex rel
GERALDINE GOEDECKE,
13                                    FILED IN CAMERA AND UNDER
                Relator,               SEAL PURSUANT TO 31 USC §
14                                    3730(b)(2)
    v.
15                                    COMPLAINT UNDER THE
    KINETIC CONCEPTS, INC.             FEDERAL FALSE CLAIMS ACT
16              Defendant.
                                      JURY TRIAL DEMANDED
17

18 | DOCKETED ON CM

OCT - 1 2008

19

20                          **COMPLAINT**

21      1.      This is an action to recover damages and civil penalties on behalf of

22   the United States of America arising from the false claims made by Kinetic

23   Concepts, Inc., in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et*

24   *seq.*, as amended.

25      2.      The False Claims Act (hereinafter the Act), originally enacted in 1863

26   during the Civil War, was substantially amended by the False Claims Amendments

27   Act of 1986 and signed into law on October 17, 1986.  Congress enacted these

28   amendments to enhance the Government's ability to recover losses sustained as a

1  Mark Allen Kleiman, Esq.
   1640 Fifth Street - Suite 214
2  Santa Monica, CA 90401
   phone  (310) 260-2303
3  fax      (310) 260-2535

4

   Attorney for Relator

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                         WESTERN DIVISION

11                                        CV08-06403 MRP (AGRx)

12  UNITED STATES ex rel          )   CASE NO.
    GERALDINE GOEDECKE,           )
13                                )
              Relator,            )   FILED IN CAMERA AND UNDER
14       v.                       )   SEAL PURSUANT TO 31 USC §
                                  )   3730(b)(2)
15  KINETIC CONCEPTS, INC.        )
                                  )   COMPLAINT UNDER THE
16            Defendant.          )   FEDERAL FALSE CLAIMS ACT
                                  )
17                                )   JURY TRIAL DEMANDED
                                  )
18  _____)

19

20                         **COMPLAINT**

21       1.     This is an action to recover damages and civil penalties on behalf of

22  the United States of America arising from the false claims made by Kinetic

23  Concepts, Inc., in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et*

24  *seq.*, as amended.

25       2.     The False Claims Act (hereinafter the Act), originally enacted in 1863

26  during the Civil War, was substantially amended by the False Claims Amendments

27  Act of 1986 and signed into law on October 17, 1986.  Congress enacted these

28  amendments to enhance the Government's ability to recover losses sustained as a

1  result of fraud against the Untied States and to provide a private cause of action
2  for the protection of employees who act in furtherance of the purposes of the Act.
3  Congress acted after finding that fraud in federal programs and procurement is
4  pervasive and that the Act, which Congress characterized as the primary tool for
5  combating fraud in government contracting, was in need of modernization.
6      3.     The Act provides that any person who knowingly presents or causes
7  to be presented a false or fraudulent claim to the Government for payment or
8  approval is liable for a civil penalty of up to $11,000 for each such claim, plus
9  three times the amount of the damages sustained by the Government, including
10 attorneys' fees.  The Act allows any person having information regarding a false
11 or fraudulent claim against the Government to bring a private cause of action for
12 himself and on behalf of the government to share in any recovery.  The complaint
13 is to be filed under seal for sixty days (without service on the Defendant during
14 such sixty-day period) to enable the Government (a) to conduct its own
15 investigation without the Defendant's knowledge, and (b) to determine whether to
16 join the action.
17     4.     Based on these provisions, Relator, Geraldine Godecke, seeks to
18 recover for the United States damages and civil penalties arising from Defendant's
19 presentation of false claims to the United States Government specifically through
20 the Medicare Health Program in connection with the improper billing for its
21 Vacuum  Assisted Closure device.
22     5.     Relator, Geraldine Godecke, has direct and independent knowledge
23 of the following conduct that violated the False Claims Act:

## PARTIES

25     6.     Relator Godecke is a resident of Dillon, Montana.  At all times
26 relevant herein, she was employed by Kinetic Concepts, Inc., (KCI).  In this
27 capacity, she gained direct and independent knowledge of the allegations
28 contained in this Complaint.

3

1        7.    Defendant, Kinetic Concepts, Inc. (KCI) manufactures the Vacuum

2    Assisted Closure device.  KCI is headquartered in San Antonio, Texas and does

3    business throughout the United States as well as the world.

4                        **JURISDICTION AND VENUE**

5        8.    This Court has jurisdiction over the subject matter of this action

6    pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confers

7    jurisdiction on this Court for actions brought pursuant to §§ 3729 and 3730 of

8    Title 31, United States Code.

9        9.    This Court has personal jurisdiction over the Defendant because the

10   Defendant regularly conducts business in California.  The Defendant has eleven

11   (11) service centers throughout California including Van Nuys and Orange,

12   California.

13       10.    Venue is proper in this district pursuant to 31 U.S.C. § 3732 (a)

14                  because the

15   Defendant routinely transacts business in the Central District of California.

16                            **BACKGROUND**

17       11.  Relator Godecke was the Director of Medicare Cash and Collections

18   from June 1, 2001 until October 1, 2007.

19       12.    According to KCI's 2006 10-K Report, Medicare accounted for

20   $165.4 million, or 12.1% of total revenue, and $148.6 million, or 12.3% of total

21   revenue, for the years ended December 31, 2006 and 2005 respectively."

22       **NEGATIVE PRESSURE WOUND THERAPY**

23       13.    KCI began manufacturing its Negative Pressure Wound Therapy

24   (NPWT) device  known as the Vacuum Assisted Closure (V.A.C.) therapy system

25   in 1995.  The device is based on patents held by Wake Forest University and

26   licensed exclusively to KCI.

27   //

28   //

14.    KCI describes its product as follows:

"KCI          has revolutionized advanced wound care with the development of Negative Pressure Wound Therapy (NPWT).  Utilizing multiple mechanisms of action, V.A.C. Therapy removes fluids and infectious materials, helps protect the wound environment, helps promote perfusion and a moist healing environment and helps draw together wound edges."

"V.A.C. Therapy is the controlled application of sub-atmospheric pressure to a wound using a therapy unit to intermittently or continuously convey negative pressure to a specialized wound dressing to help promote wound healing."

"The wound dressing is a resilient, open-cell foam surface dressing . . . that assists tissue granulation and is sealed with an adhesive drape that contains the sub-atmospheric pressure at the wound site."

"Special T.R.A.C. Technology enhances patient safety by regulating pressure at the wound site."

"Additionally, the V.A.C. Therapy System helps direct drainage to a specially designed canister that reduces the risk of exposure to exudate fluids and infectious materials." (KCI Website - http://kci1.com)

## MEDICARE AND NEGATIVE PRESSURE WOUND  THERAPY PUMPS

15.    The V.A.C. is classified for Medicare reimbursement purposes as Durable Medical Equipment - Prosthetics, Orthotics, and Supplies (DMEPOS). This category of medical equipment includes such items as wheelchairs, walkers, blood glucose monitors, etc.

16.    Tri-Centurion, the Program Safeguard Contractor (PSC) for Medicare Durable Medical Equipment Medical Region Contractor (DMAC) for regions A and B describes Negative Pressure Wound Therapy as follows:

"Negative pressure wound therapy (NPWT) is the controlled application of sub-atmospheric pressure to a wound using an electrical pump to intermittently or continuously convey sub-atmospheric pressure through connecting tubing to a specialized wound dressing which includes a resilient, open-cell foam surface dressing, sealed with an occlusive dressing that is meant to contain the sub-atmospheric pressure at the wound site and thereby promote healing."

5

Tri-Centurion, PSC, Local Coverage Decision, (LCD)

17.   The NPWT pump or vacuum is rented but the supplies are purchased. The supplies needed to support this treatment include a dressing and a canister.

## MEDICARE PRICING FOR V.A.C., KCI'S NEGATIVE PRESSURE WOUND THERAPY DEVICE

18.   The one month KCI V.A.C. rental price is $1,716.46, but in the fourth month the rental price is reduced by 25%, to $1,287.35 (Medicare Code E2402).

19.   The price of one dressing is $27.42 and on average fifteen (15) dressings are used each month (Medicare Code A6550) which results in a $411.30 monthly charge for the dressings.

20.   The price of one canister is $9.54 and on average ten (10) canisters are used each month (Medicare Code A7000) which results in a $95.40 monthly charge for the canisters.

21.   The total monthly cost of the KCI V.A.C. is about $2,223.16 for a typical Medicare patient.

## MEDICARE'S GENERAL POLICY REGARDING REIMBURSEMENT FOR NEGATIVE PRESSURE WOUND THERAPY PUMPS SUCH AS KCI'S V.A.C.

22.  Medicare has no National Coverage Decision (NDC) regarding reimbursement for NPWT, but rather only a local coverage decision ("LCD") which is used in each of the nation's four Durable Medical Equipment Medical Regional Contractor Centers (DME-DMACs).

23.  The LCD, as developed by Tri-Centurion (the Program Safeguard Contractor [PSC] for Medicare DME-DMAC Regions A and B), establishes the guidelines used nation-wide for Medicare reimbursement for Negative Pressure Wound Therapy, including therapies using KCI's V.A.C. product.

//

24.   The LCD describes Negative Pressure Wound Therapy (NPWT) as follows:

> Negative pressure wound therapy (NPWT) is the controlled application of sub-atmospheric pressure to a wound using an electrical pump to intermittently or continuously convey sub-atmospheric pressure through connecting tubing to a specialized wound dressing . . . which includes a resilient, open-cell foam surface dressing, sealed with an occlusive dressing that is meant to contain the sub-atmospheric pressure at the wound site and thereby promote healing.

25.   Medicare will only cover treatment utilizing NPWT for a maximum period of four (4) months unless special clinical circumstances exist and are agreed to by the responsible DME DMAC.

### MEDICARE'S SPECIFIC POLICY REGARDING COVERAGE FOR WOUNDS WHICH HEAL THEN RESTART ("RESTARTS") AND OTHER CIRCUMSTANCES RESULTING IN INTERRUPTIONS IN THERAPY.

26.   Medicare does not recognize or provide coverage for NPWT which is interrupted.

27.   Medicare Part B provides coverage or reimbursement for NPWT, including the rental of KCI's V.A.C. system and purchase of KCI's supplies, if the following three conditions are met: (a) the equipment meets the definition of DME [Medicare has approved the V.A.C. and its supplies as DME]; (b) the equipment is necessary and reasonable for the treatment of the patient's illness or injury or to improve the functioning of his/her malformed body member; and (c) the equipment is used in the patient's home.

28.   Pursuant to the LCD for NPWT, coverage ends when the "equipment or supplies are no longer being used for the patient, whether or not by the physician's order."

//

//

## KCI'S BILLING POLICY AND PRACTICE REGARDING "RESTARTS" CONFLICTS WITH MEDICARE's COVERAGE POLICY.

29. KCI commonly submits claims for V.A.C. therapies which have been placed "on hold" for a period of time or in circumstances in which home therapy is discontinued prior to complete wound healing and then resumed ("home therapy resumed"). Collectively, KCI commonly refers to these situations as "Restarts."

30. Medicare policy does not authorize or recognize interruptions in NPWT on the same wound. Once qualified for reimbursement, coverage ends the moment the V.A.C. is removed from a patient.

31. However, occasionally a patient's NPWT is interrupted or discontinued prior to full wound closure or healing (due to mismanagement of medical care, patient choice or a variety of other reasons). In such circumstances, a medical provider often requests that V.A.C. therapy be re-started.

32. If a "restart" is requested, KCI identifies the circumstance as one in which the V.A.C. was either (a) placed "on hold"; or (b) if therapy had been officially discontinued according to the patient's medical records, then KCI identifies it as "home therapy resumed."

33. In the "on hold" cases, KCI simply continues the normal billing cycles, without interruption. A claim is improper or false if therapy is reimbursed beyond the hold cycle, i.e., when another thirty-day cycle is triggered beyond the hold.

34. In the "home therapy resumption" cases, every claim is false or over-billed because resuming therapy, once it has been terminated, is not reimbursable under any circumstances. This is true under the Medicare regulations whether or not the patient benefitted from the resumption of therapy or not.

35. The volume of "restarts" unlawfully billed by KCI is significant. Relator estimates that KCI falsely billed Medicare approximately $42,100,000 in "restarts" between 2003 and 2007. Relator calculates this estimate as follows:

//

8

a. Relator reviewed the records of 945 of KCI's Medicare patients which were submitted for payment to Medicare's DME DMAC Region A from January 2007 through June 2007.

b. Of the 945 records or claims so reviewed, 126 claims were false or improper because they were for V.A.C. therapy provided after coverage legally ended, also known to KCI as a "restart."

c. Each claim for V.A.C. therapy is approximately $2,000.00.

d. By extrapolation, Relator estimates the amount of improperly billed "restarts" in 2007 to be $11,730,000 based on her knowledge that KCI had approximately 44,000 Medicare patient claims in 2007, with an average value of $2,000 per patient, per claim.

Relator utilized the following formula for her calculation:

44,000 (total amount of Medicare patient claims in 2007) ÷ 945 (the number of claims Relator reviewed from January through June 2007) = 46.56

46.56 x 126 (the number of claims Relator found to have been improperly billed in her sample) = 5,866.56

5,866.56 x $2,000.00 (estimated value per claim) = $11,733,333.33.

e. KCI's claims submitted to Medicare have increased approximately 20% per year. KCI's "restarts" billing practice has been consistent during the years 2003 through 2007, as has Medicare's coverage policy. Accordingly, Relator calculates the approximate value of improperly billed "restarts" since 2003 as follows:

| | |
|---|---|
| 2003: $5.66 million | |
| 2004: $6.79 million | |
| 2005: | $8.15 million |
| 2006: | $9.78 million |
| 2007: | $11.73 million |
| **TOTAL:** | **$42.11 million** |

## MEDICARE'S POLICY REGARDING COVERAGE AND BILLING FOR NPWT WHEN A PATIENT IS TRANSFERRING FROM A HOSPITAL OR SKILLED NURSING FACILITY TO THE HOME ("TRANSITION CLAIMS")

36.  The V.A.C. is a covered DMEPOS for use in hospitals or skilled nursing facilities and is billed in accordance with the LCD under Part A of Medicare.

37.  The V.A.C. is also a covered DMEPOS for use in a patient's home, in accordance with the provisions of the LCD.  However, when used in the home, reimbursement is made under Medicare Part B.

38.  The standard start date for billing a DMEPOS item for KCI is the date the Proof of Delivery (POD) is signed by the beneficiary or by a non-supplier affiliated person on the beneficiary's behalf if the beneficiary is unable to sign.

39.  However, an exception to the general rule of billing from the Date of Delivery arises under Medicare's Durable Medical Equipment Policy which addresses billing for covered DMEPOS items in anticipation of discharge from a hospital or skilled nursing facility.  The policy is focused on billing from the date of discharge and provides, in relevant part, as follows:

> "A supplier may deliver a DMEPOS item to a patient in a hospital or nursing facility for the purpose of fitting or training the patient in the proper use of the item.  This may be done up to two days prior to the patient's anticipated discharge to their home.  The supplier should bill the date of service on the claim as the date of discharge and shall use the Place of Service (POS) code 12 (Patient's Home).  The item must be for subsequent use in the patient's home.  <u>No billing may be made for the item on those days the patient was receiving training or fitting in the hospital or nursing facility.</u>  (Emphasis added.)

> "A supplier may not bill for drugs or other DMEPOS items used by the patient prior to the patient's discharge from the hospital or a Medicare Part A nursing facility stay.  Billing the DME MAC for surgical dressings, urological supplies or ostomy supplies that are provided in the hospital or during a Medicare Part A nursing facility stay is not allowed.  These items are payable to the facility under Part A of Medicare.  This prohibition applies even if the item is worn home by the patient from the hospital or nursing facility.  Any attempt by the supplier and/or facility to substitute an item that is payable to the supplier for an item that, under statute, should be provided by the facility, may be considered fraudulent.  These statements apply to

durable medical equipment delivered to a patient in hospitals, skilled nursing facilities (POS = 31), or nursing facilities providing skilled services (POS = 32).

"A supplier may deliver a DMEPOS item to a patient's home in anticipation of a discharge from a hospital or nursing facility. The supplier may arrange for actual delivery of the item approximately two days prior to the patient's anticipated discharge to their home. The supplier shall bill the date of service on the claim as the date of discharge and should use the POS code 12 (Patient's Home). (Emphasis added.)

## KCI'S BILLING POLICY AND PRACTICE REGARDING "TRANSITION CLAIMS" AND HOW IT CONFLICTS WITH THE ABOVE MEDICARE COVERAGE AND BILLING POLICIES.

40. KCI exclusively uses the date the Proof of Delivery is signed as the start date for billing, regardless of the patient's date of discharge as required by Medicare policy. Since billing is done on a rolling thirty day cycle (which varies for each patient depending on the date home use began), KCI's practice of solely billing from the date of delivery as opposed to the date of discharge results in numerous false claims or an improperly billed and paid final thirty-day cycle.

41. For example, if the V.A.C. were delivered to a patient's home on September 18, because KCI uses the Proof of Deliver date to trigger billing, the billing cycle would begin on September 18, even if the patient were to remain in the hospital or SNF for three or more days after the delivery date. Since the rental is for a full month, regardless of how long the V.A.C. is used, a patient using the V.A.C. at home for thirty days from September 21 to October 21, would trigger a second billing cycle which, under this example, would begin on October 18. The bill for the second month is false, since the V.A.C. was used for only one month.

42. KCI's choice to bill from the date of delivery rather than the date of discharge is based upon two false premises:

a. KCI contends that since it does not always know the date of discharge or that such date is too difficult to determine, "ignorance is defendable"; and

b. KCI asserts that the matter raises a technical error that the DME DMACs can identify, and if they do, then the additional month will be denied and KCI will concur. Thus "no harm no foul." However, if the DME DMACs do not catch the billing error, as is often the case, KCI then keeps the improper payment.

43. Relator had numerous discussions with KCI management over the years regarding KCI's noncompliance with Medicare billing, collection and appeals policies. For example, with respect to the "transition claims" discussed herein, in late August or early September 2007 (shortly before Relator was fired) Relator was involved in a telephone conference with Linnet Long (KCI Business Systems Analyst), Theresa Duffy (KCI Clinical Manager), Shannon Truman (KCI Appeals Supervisor), Deb Smith (Vice President, KCI-MedClaim), Scott Jones (KCI Internal Auditor), Theresa Johnson (KCI Senior Vice President) and others. The parties to the telephone conference discussed compliance risks regarding some recent Medicare-audited claims. In the discussion, "transition claims" was one of the topics (as well as "restarts", "risk sharing" and other KCI compliance concerns). Deb Smith insisted Relator's concerns regarding billing from delivery dates versus properly billing from discharge dates was simply too cumbersome. Deb Smith stated that if a claim did get improperly paid, it was "no harm no foul" because Medicare would catch the claim and deny it, and it could be addressed later. Relator replied that she had evidence that Medicare did not catch a significant number of these types of claims. Relator was instructed by Theresa Johnson that it was not acceptable to argue with Deb Smith and that the parties needed to "get along."

44. KCI improperly transfers the duty of identifying the date of discharge, and thus the limits of coverage or reimbursement, from itself to the DME DMACs. KCI does so intentionally, knowing that only one of the four DME DMACs has created the claim review filters necessary to catch the error. KCI relies on the

inefficiencies of the DME DMACs and their lack of communication amongst the four centers to minimize its risk exposure.

45.  KCI management reported in 2007 Q2 that 40% of initial placement of NPWT were to patients transitioning care settings.  A percentage of those claims result in over billing for the reasons described above.

46.  The volume of "transition claims" unlawfully billed by KCI is significant.  Relator estimates that KCI falsely billed Medicare approximately $4,840,000 in "transition claims" between 2003 and 2007.  Relator calculates this estimate as follows:

a.  KCI had approximately 44,000 Medicare patient claims in 2007.  Forty percent of these claims, or approximately 17,600, were for patients transitioning from a Medicare Part A facility to a home or Medicare Part B setting.

b.  Relator estimates that 25% of the 17,600 claims, or 4,400 were for situations where home billing overlapped hospital or nursing home billing by an average of four days, not counting the day of discharge.  The value of an over billed month for transition claims is approximately $2,300.00.[1]

c.  4,400 claims x $2,300 = $1,350,000.

d.  Based upon KCI's annual increase of approximately 20% in Medicare claims between 2003 and 2007, Relator estimates the total value of improperly billed "transition claims" is $4,840,000.

47.  The harm to Medicare is two-fold:

a.  KCI receives and keeps the over billed amounts.

b.  By intentionally submitting incorrect claims, the burden is shifted to the DME DMACs to identify and deny those which were improperly

---

[1]  At an average $2,300.00 per claim, transition claims cost more than "restart claims" due, in part, to the fact that transition claims have all the supplies included in the bill.

filed.  This is a significant, improper and unnecessary administrative burden placed upon the DME DMACs and is created  directly by KCI's refusal to follow the clear and explicit policy of billing only from the actual discharge date.  The man-power and resources consumed by the DME DMACs to identify and deny these improper claims keeps the DME DMACs from other work necessary to maintain the integrity of the Medicare program, and thus deprives the Government of the honest services of its contractors.  (18 U.S.C. § 1341, 1346.)

48.  KCI knowingly misrepresents the accuracy of its records when it submits these claims to the DME DMACs.

## FIRST CAUSE OF ACTION

### *(False Claims Act 31 U.S.C. §3729 (a)(1) and (a)(2)*

49.    Relator alleges and incorporates by reference the allegations made in paragraphs 1 through 48 of this Complaint.

50.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32.

51.    By virtue of the acts described above, the Defendant knowingly presented, caused to be presented and continues to present and to cause to be presented false or fraudulent claims for payment and reimbursement to Medicare, an agency of the United States Government, by knowingly or recklessly billing the United States Government for the V.A.C. device.

52.    By virtue of the acts described above, the Defendant knowingly made, used or caused to be made or used, and continues to make or use or cause to be made or used, false statements to obtain Federal Government payment for false or fraudulent claims because the Defendant falsely certified that its request for reimbursement for the V.A.C. was in accordance with Medicare rules.

//

1    53.    As set forth in the preceding paragraphs, Defendant violated 31

2  U.S.C. § 3729 *et seq.*, and has thereby damaged and continues to damage the

3  United States Government by its actions in an amount to be determined at trial.

4

5                          **SECOND CAUSE OF ACTION**

6                      *(False Claims Act 31 U.S.C. §3729 (a)(3))*

7    54.    Relator Godecke realleges and incorporates by reference the

8  allegations made in Paragraphs 1 through 48 of this Complaint.

9    55.    This is a claim for treble damages and for penalties under the False

10  Claims Act, §§ 3729-32.

11    56.    By virtue of the acts described above, the Defendant defrauded the

12  United  States by billing Medicare when the treatment was not in accordance with

13  Medicare rules and guidelines.

14    57.    The United States, unaware of the falsity of the records, statements

15  and/or claims made by the Defendant and in reliance on the accuracy thereof, paid

16  for the aforementioned false claims because the Defendant intentionally or with

17  reckless or gross disregard or in deliberate ignorance of and for the truth billed

18  Medicare for treatment that was not in accordance with Medicare rules and

19  guidelines.

20    58.    By virtue of the acts described above, the Defendant defrauded the

21  United States.

22    59.    By reason of these actions and payments, the United States

23  Government has been damaged and continues to be damaged in substantial

24  amounts.  The exact amount of the damage is to be determined at trial.

25  //

26  //

27  //

28  //

## THIRD CAUSE OF ACTION
### *(Retaliation In Violation of 31 U.S.C. §3730(h))*

60.  Relator repeats and repleads and incorporates by reference herei each and every one of the allegations contained in paragraphs 1 through 48 above, as though fully set forth herein.

61.  On June 1, 2001, Relator became employed by MedClaim, Inc., an independent contractor working for KCI.  KCI later purchased MedClaim and Relator continued working for the company until she was terminated on October 1, 2007.

62.  At the time of Relator's hire, the V.A.C. was a newly coded and authorized medical device under Medicare's complex rules.  Virtually all billing and collection documents and processes were developed for this device during Relator's tenure, both within Medicare and at KCI.

64.  Relator quickly developed a specialized knowledge related to Medicare collections and appeals for the V.A.C.  Relator began as the office manager in Dillon, Montana with two employees.  Under her leadership and direction, and within the next six years, the Dillon, Montana office grew to 105 employees, all of whom were under Relator's supervision, and all of whom worked on KCI's Medicare collections and appeals.

65.  The Dillon, Montana office was instrumental in driving the development within Medicare of the collection and appeals process for the V.A.C., which process became applicable nation-wide.  At the same time, Relator was responsible for developing and implementing collection and appeals policies within KCI.

66.  Relator continually challenged her superiors within KCI regarding the company's interpretation of  billing and collection policies.  By September of 2007, Relator became insistent that KCI was violating the policies described herein and placing the Company at significant risk.

1    67. In mid-September, 2007, Relator's boss, Rich Brinkley, was fired from

2 KCI. Shortly after his termination, Mr. Brinkley called Relator to explain that one

3 of the reasons he was fired was because he refused to fire her. Mr. Brinkley also

4 warned Relator that executive management at KCI was concerned that she may

5 become a "whistleblower" under the False Claims Act and that her employment

6 was in jeopardy. Mr. Brinkley further stated that senior management at KCI was

7 concerned that she had too much access to information that could be used in a

8 whistleblower case.

9    68. On or about September 25, 2007, Relator was called to a Dillon,

10 Montana hotel room to meet with Theresa Johnson, KCI Senior Vice President,

11 and Louie Rivera, KCI's Human Resources Director. Ms. Johnson told Relator

12 that although she had performed exceedingly well for KCI, nevertheless, as of

13 October 1, 2007, her employment with KCI would be terminated.

14    69. Ms. Johnson's explanation of the reason for Relator's termination was

15 that she had not managed the financial matters strongly enough in the Dillon,

16 Montana office. However, management of office financial matters had never been

17 included in Relator's job description.

18    70. Relator was told that she was barred from returning to KCI's Dillon,

19 Montana offices and that her personal items would be gathered up and delivered to

20 her off-site.

21    71. During the meeting described above, Theresa Johnson handed Relator a

22 letter from KCI offering a "severance package." In the letter, KCI offered to pay

23 Relator One Hundred Thousand Dollars ($100,000.00) in exchange for a promise

24 to protect and maintain the confidentiality of all information Relator had learned

25 while employed at KCI and for release of her employment-related claims. Relator

26 refused the offer.

27    72. At the time of Relator's termination, she was earning a base salary of

28 approximately  $90,000.00 per year, in addition to generous bonuses which varied

1  year to year based upon KCI's financial performance.  In addition, Relator enjoyed

2  health insurance, life insurance and options to purchase KCI stock, which she

3  regularly exercised.

4      73.  Relator has been unable to secure comparable employment in the

5  Dillon, Montana area, which has a population of approximately 5,000 people,

6  despite her efforts to do so.

7      74.  As a result of her termination from employment at KCI, Relator has

8  suffered economic losses in the form of lost wages and lost benefits. Relator has

9  also suffered significant emotional distress and mental anguish.

10      75.  Relator was harassed, retaliated against, discriminated against in the

11  terms and conditions of her employment, and fired from her employment at KCI in

12  direct retaliation for her efforts to investigate or otherwise address the false claims

13  described hereinabove, her efforts to change KCI policy to comply with Medicare

14  coverage and billing requirements, and her resistance to the submission of false

15  claims.  KCI violated 31 U.S.C. §3730(h) by carrying out the acts against Relator

16  as described herein.

17      76.  As a direct, foreseeable and legal result of said wrongful acts by

18  Defendant, Relator has suffered and will continue to suffer substantial losses in

19  earnings and other valuable employment benefits, along with other incidental and

20  consequential damages and losses, all in an amount to be proved at trial.

21      77.  As a further direct, foreseeable and legal result of said wrongful acts of

22  Defendant sued herein, Relator has suffered and will continue to suffer mental

23  pain and anguish and emotional distress, all to her damage in an amount to be

24  proven at trial.

25      78.  As a further direct, foreseeable and legal result of said wrongful acts by

26  said Defendant, Relator has incurred attorneys' fees and costs, for which Relator

27  claims, in an amount to be determined at trial.

28

## **PRAYER FOR RELIEF**

WHEREFORE, Relator prays for judgment against Defendant as follows:

## **FOR THE FIRST AND SECOND CAUSES OF ACTION**

1.      That Defendant cease and desist from violating 31 U.S.C. § 3729, *et seq.;*

2.      That this Court enter judgment against the Defendant in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 *et seq.;*

3.      That Relator be awarded the maximum amount allowed pursuant to § 3730 (d) of the False Claims Act;

4.      That Relator be awarded all costs and expenses of this action, including attorney's fees; and

5.      That Relator recover such other relief as the Court deems just and proper.

## **FOR THE THIRD CAUSE OF ACTION**

6.      That Relator receive two times her back pay and interest on her back pay, including all fringe benefits;

7.      That Relator receive compensation for her loss of future income;

8.      That Relator receive compensation for all other special damages;

9.      That Relator receive compensation for her general damages;

10.      That Relator be reinstated with full seniority;

//

//

//

1    11.    That Relator be awarded all costs and expenses of this action,

2  including attorney's fees; and

3    12.    That Relator recover such other relief as the Court deems just and

4  proper.

5

6                                    Respectfully submitted,

7

8  Dated:   September 29,  2008    LAW OFFICES OF MARK KLEIMAN

9

10    BY:

11                                  Mark Allen Kleiman
                                    California Bar No. 115919
12                                  1640 Fifth Street, Suite 214
                                    Santa Monica, CA 90401
13                                  (310) 260-2303
                                    (310) 260-2535 (fax)
14                                  Attorney for Relator

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1            **DEMAND FOR JURY TRIAL**

2   Relator hereby demands trial by jury.

3

                  Respectfully submitted,

4

5   Dated:  September 29, 2008   LAW OFFICES OF MARK KLEIMAN

6

7                    BY:

8                     Mark Allen Kleiman
9                     California Bar No. 115919
                     1640 Fifth Street, Suite 214
10                  Santa Monica, CA 90401
                     (310) 260-2303
11                  (310) 260-2535 (fax)
                     Attorney for Relator

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 29, 2008, a copy of the foregoing COMPLAINT UNDER THE FEDERAL FALSE CLAIMS ACT AND DISCLOSURE STATEMENT  were sent via a reliable source of overnight mail delivery addressed to:

Hon. Michael Mukasey
Attorney General
U.S. Department of Justice
10th & Constitution Ave., NW
Washington, DC  20530

Civil Process Clerk
United States Attorney's Office
300 N. Los Angeles Street
Room 7516
Los Angeles, CA 90012

Mark Allen Kleiman

22

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Mariana P. Pfaelzer and the assigned discovery Magistrate Judge is Alicia G. Rosenberg.

The case number on all documents filed with the Court should read as follows:

## CV08- 6403 MRP (AGRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

The United States District Judge assigned to this case will review all filed discovery motions and thereafter, on a case-by-case or motion-by-motion basis, may refer discovery related motions to the Magistrate Judge for hearing and determination

=========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) <br> United States of America, ex rel. Geraldine Goedecke | DEFENDANTS <br> Kinetic Concepts, Inc. |
|---|---|
| (b) County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases): | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only): <br> Bexar County |
| (c) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) <br><br> Mark Allen Kleiman, 1640 Fifth Street, Suite 214, Santa Monica, CA 90401; 310-260-2303 | Attorneys (If Known) <br><br> Unknown |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1 U.S. Government Plaintiff ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☐ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
31 U.S.C. §§ 3729, et seq

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS <br> PERSONAL INJURY | TORTS <br> PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities /Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☒ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | FEDERAL TAX SUITS |
| | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s): N/A

**FOR OFFICE USE ONLY:** Case Number: _____

CV-71 (07/05)        **CIVIL COVER SHEET**        Page 1 of 2

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET
### AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

VIII(b).  RELATED CASES: Have any cases been previously filed that are related to the present case? ☐ No  ☑Yes

If yes, list case number(s):  CV 08-01885 GHK (JWJx)

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☑A.  Arise from the same or closely related transactions, happenings, or events; or
☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
☑C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE: List the California County, or State if other than California, in which EACH named plaintiff resides (Use an additional sheet if necessary)
☑Check here if the U.S. government, its agencies or employees is a named plaintiff.

**Montana**

List the California County, or State if other than California, in which EACH named defendant resides.  (Use an additional sheet if necessary).
☐ Check here if the U.S. government, its agencies or employees is a named defendant.
Texas

List the California County, or State if other than California, in which EACH claim arose.  (Use an additional sheet if necessary)
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____  /Mark Allen Kleiman__   Date____ September 29, 2008

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969 (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |